Are you ready for me, Your Honors? We're ready for you. Oh, okay. Thank you. Good morning, Judge Baya, Judge Kristen, and welcome back to Las Vegas, the ninth island of Hawaii, to Judge Bennett. Thank you for coming here. My name is Robert Spretnak. I am the attorney for the plaintiff appellant, Nicole Foster, in this matter. This matter is an FMLA case on the interference and retaliation strands of the FMLA with some ADA issues also involved. But the primary thrust of the case is the FMLA issue. And the preliminary issue for the FMLA is whether or not we have presented evidence of a genuine issue of material fact with regard to the issue of willfulness. And willfulness is a very difficult issue to decide as a matter of law. And we believe that Ms. Foster has presented very significant evidence that the violation of the FMLA was willful. What was that evidence? I'm sorry? What was that evidence? The evidence of that would be, number one, that there was an e-mail directive sent out that she was to use her paid time when she took her intermittent FMLA. Why is that willful as opposed to being a mistake that was corrected really very promptly? The totality of the circumstances and the fact that she ended up being fired within a couple of days. And there's actually a very recent, and Judge Baya was on the panel, so I know he's aware of the Maya. I don't usually pronounce my name Baya. Okay. I'm sorry. Baya. And I can't even use the excuse that my studying Portuguese destroyed my Spanish pronunciation. Even in Portuguese it wouldn't work. No, no. The ohs and the oohs at the end are the difference. Okay. So you were saying that evidence of willfulness includes an e-mail directing that her pay be docked. That's my word. Yeah. Dale Mason, who she had a history of trouble with. What other evidence? Okay. She had a long history of problems with Mason. Mason was the fill-in supervisor.  And docked her pay. And then after she told her regular supervisor, Terrence Taylor, of the problem, Terrence Taylor said that they will talk, he and the vice presidents, will talk to Mason about his problems that he had with her FMLA time. Is there other evidence of willfulness? Well, in the fact that then she was fired after doing the complaint was evidence that they knew that they had, Mason knew that he had violated the law. And the company lied about the reasons for her complaint, which is another, I'm sorry, lied about the reasons for her termination, which is. Back up. Can we back up? So she was terminated, but at that point, we're trying to get through Judge Bea's question about evidence of willfulness. Yes. And you're citing the fact that she was terminated. So Mason didn't have anything to do with her termination. He wasn't a decision maker. Oh, Mason was central to her termination. I asked a different question. Did he participate in the decision to terminate her? He's not identified on that list. He was the one who got the statements that got her fired, and the company lied about his involvement in getting the statements. So you're not answering my question. I think he's not. Do you have any evidence he participated in that termination decision? I understand there's this other, and I don't mean this pejorative, there's this other conspiracy, this thought that he was behind cooking up these false allegations. I'm going to set that aside for a minute, just for purposes of clarity of the record. My understanding is that Mason did not participate in the decision to fire her, and that the people who did cited the results of the investigation that indicated your client made some racist and homophobic comment. You are correct that there is nothing in the record actually putting Mason at the scene of the termination, but there is plenty of evidence of his involvement in the termination. What is that, please? The fact that he got the statements. The statements were, at least one of them was actually referring to that it was being given to Mason, even though Vera, the HR person, Vera Yanis Turigny. She testified those statements came to her directly. Correct, and that was absolutely false. Okay. So the fact that they felt the need to cover up Mason's involvement. Who felt the problem is there's a dysfunction, a disconnection in your case. You have claims that Mason and Yanis Turigny put together some lies about Foster. Yes. Let's suppose that's true. Take that as true. What is the connection between those falsely produced documents and the decision makers? If the decision makers didn't know that that was false and weren't in cahoots with Mason and Yanis Turigny, your argument fails. But I would disagree with the first prong of your statement. The company knew that it was a lie because they lied. I'm sorry. What is the evidence that the decision makers at Credit One knew it was a lie? Page, please. There is no evidence that the decision maker actually talked to the people submitting the statements. No, no, no. Talk to it. What's the evidence that the decision makers knew the evidence was phony? Where? Vera Yanis Turigny was involved in the termination process, talking to her boss, Megan Lago. Is there any evidence that the decision makers knew that the evidence was phony? And if it is, point it out to me. Okay. We really don't have clear evidence of who all was involved in the decision. I'm not talking about clear evidence. I'm talking about any evidence. Okay. Well, I was going to say the best piece of evidence we have is what I've discussed, that Vera Yanis Turigny was involved in the termination decision. That's a conclusion, was involved. A investigator collects evidence. He's a phony. He's on the take. He's a bad guy. All right? Yes. But he presents that evidence to an impartial group that has no idea that it is phony and that he's a bad guy. They're not in with the investigator. That group determines the facts based on the investigation. Tell me, what is the connection between the phony investigator and the decider in this case? Well, one of the connections would be, of course, the long history that Ms. Foster had of having problems with Mr. Mason that everybody involved in the decision was well aware of. But, counsel, on that point, I'm a little bit confused by that argument. I mean, I'm looking at some of the evidence in the record about prior problems before this alleged phony story incident. So I'm looking at a corrective action report from 2013. I'm looking at another corrective action report from 2009, a corrective action report from 2016. And I see nothing in the record. And I can give you the page sites, SCR 233, SCR 228, starting SCR 244. And I see nothing in the record to indicate that those problems with your client, in which Mr. Mason was her supervisor, that there's anything in the record to suggest that those were phony. Am I missing something? Yes. In Ms. Foster's affidavit and Ms. Foster's deposition testimony, she discusses the long history of issues that she had with Mason and that Mason was doing these things to her to prevent her from earning performance bonuses. And so there's testimony in the record on that. But is there anything where she says, no, I didn't display an unprofessional and abrasive tone when responding to a cardholder? No, I didn't say to somebody, we can handle it outside if you don't like what's going on. I mean, maybe it's there and I missed. No, that's actually not in the record. The company has been adamant that it was that single incident involving the two statements that was the grounds for termination. So that wasn't something we explored in putting together the record. But the record does discuss Ms. Foster complaining about the harassment and bullying from Mason and earlier in 2018 actually getting removed, actually going out on FMLA leave because of the harassment and bullying from him. And then when she returned, she was then under Terrence Taylor, a new supervisor. So that part is well-developed in the record. But your particular point, because that didn't factor in the termination, we did not develop the record on that point. Okay. But getting back to the issue of the evidence, they knew that there was a long history of Mason. They never actually confronted her with the allegation against her. We didn't know until the unemployment hearing several months later that these two statements was the grounds for termination. How can you refute and give your version of what happened when you're not even told what the allegations are against you? She wasn't given a reason for her termination? Not that it was those particular two statements, that she had used the N-word and had used a homophobic slur. What was she told about the reason for her termination? Well, the termination notice is in the record. Was there anything else other than the termination notice we've seen in the record? No, that's it. But the termination notice says, am I at the wrong place? Two employees reported inappropriate offensive conduct relating to sexual orientation and race made by Nicole regarding another supervisor. Human Resources conducted a full investigation and it was determined to sever employment with Nicole. She didn't have that when she was terminated? She was just told about offensive comments. She wasn't told who said them, what the comments were, what the context was, when they supposedly were made? Because there's very important evidence of that where supposedly it happened in the lunchroom and Ms. Foster's been adamant that she didn't even eat lunch in the lunchroom. Help me on one other point. When I'm looking at this, it says under employee acknowledgement, and this is all dated 12-21-18, employee did not sign. Is there evidence in the record, like through your client's declaration, that on December 21, 2018, when this is dated, no one even showed it to her or asked her to sign it? That I don't know, but I do know that at the time of termination, after the termination decision was made, she was told it was in general about offensive comments, but no specific details about who accused her of it, when it was, what they were in reference to. And again, that did not come out until the unemployment hearing. So I would take issue with their statement of that there was a full investigation because they never confronted Ms. Foster with the allegations against her. It was kind of clear, and this again is evidence of willfulness, that there was a predetermined outcome, and it was a railroading based upon a predetermined outcome of solving this Mason and Foster issue that had been festering for many years, and solving it by getting rid of the non-supervisory employee. And therefore, that's the evidence of willfulness. I see my time is up. Any further questions, or we'll wait for rebuttal on the further questions? It doesn't appear there are further questions at this time.  And I will reserve what time I have left, if I have any, for the rebuttal. That's fine. Okay. You have about a minute and a half, a little more than that. We'll hear from opposing counsel, please. Good morning, Your Honors. May it please the Court, Noel Mitzuko-Hernandez on behalf of Credit One. Credit One terminated Ms. Foster after Ms. Hernandez, would you pick up on the last statement that your learned friend made, that Foster was never confronted with the statements of her using the N-word and the homosexual slur? Yes, Your Honor. Is that correct? No, Your Honor. In the record, we do have investigation notes where the two employees who reported this incident, they were independently interviewed and confirmed that she said these things, and Ms. Foster was also interviewed. That's not Judge Behr's question. Oh. Ms. Foster was also interviewed, and it's part of the investigation record. I have the witness interview notes as ER 185 through 192, and she was also provided with her termination notice, which it was indicated she refused to sign. And does the termination notice mention the particular slurs? The termination notice does not reference the particular slurs, but in the interview notes, Ms. Foster does deny. She says, I did not say those things. So I believe that in those, in her interview, she was told what was reported that she said. So was, do these interview notes that you reference, do they indicate that the plaintiff was told who the alleged witnesses were to the slurs? Typically, in these types of investigations... No, no, I'm not asking typically. I'm asking what the record is. There's no evidence in the record that Ms. Foster was told who reported, and that's common because we try to keep it confidential. Is there any evidence in the record that she was told specifically what the slurs were? No, Your Honor. Is there any evidence in the record that she was told what date the alleged slurs had occurred? I don't, I don't believe so, but I believe she returned from her FMLA leave December 18, and she was interviewed December 20th. So she would have known it was within that timeframe. She would have known that somebody said that she said words that were offensive because they were a racial slur and a homophobic slur, and she doesn't... Did she know who they were about, to whom they were directed? I believe so. I'm just trying to figure out how she's supposed to respond to this. She doesn't know who said... Well, she... Who's accused her of what exactly? She denies saying these things in her interview notes. It says she denies saying this, so she must have been told, you know, what was said and about who. Pardon me, she denies making slurs. Yes. But I'm not clear on your response as to whether she was ever told what the slurs were, and did she deny making those specific slurs, or was she always told you were accused of making slurs? Your Honor, I... I'm not sure. I don't have the, you know, questions that were asked during the interview. But you have the record. Yes. Point to me anywhere in the record where a reasonable fact finder could find that she was informed of the specific slurs that were used. The best evidence I have is her interview notes. At 185 and 192? Yes. All right, I'll take a look. Go ahead.  So Credit One received these reports where she called her prior supervisor the N-word and the F-word. They immediately conducted a full and thorough investigation. They interviewed both employees who reported this conduct. They both independently confirmed that she did, in fact, say these things about her prior supervisor in violation of company policy. And that is the legitimate non-discriminatory reason for her termination. Now, Ms. Foster has brought claims of ADA discrimination, ADA retaliation, and FMLA interference. However, at her deposition, she testified that she does not believe her medical condition or FMLA leave had anything to do with her termination. And on that basis alone, this court should affirm summary judgment on behalf of Credit One. Now, turning to the ADA discrimination claim, there is no causal connection between her alleged medical condition and her termination, and she admits this at her deposition. And the company had a legitimate non-discriminatory reason for its termination decision. There's no evidence in the record that there was any scheme to get Ms. Foster fired, and there's no evidence in the record that Credit One was complicit in the scheme or that the scheme had anything to do with her alleged medical condition or FMLA leave. There's no evidence of any agreement between any of the employees or anything like that. Ms. Foster merely points to the fact that the reports were made to Mr. Mason. However, that's pretty common. If you hear something offensive, you report it to your supervisor, and they report it to HR. And the court should look at the fact that Credit One did an independent investigation. Mason was not involved in the investigation, and Mason was not involved in the termination decision. And as long as the termination decision is based on facts supported by substantial evidence and Credit One reasonably believed those facts to be true, neither this court nor a jury can second-guess Credit One's business decision. Now, turning to Ms. Foster's ADA retaliation claim, Ms. Foster did not engage in any protected activity. She never complained about any violations of the ADA. She complained about Mr. Mason on two occasions, neither of which had to do with the ADA. Her first complaint occurred during her first FMLA leave in July 2018. She complained that she did not like his managerial style, she felt he was too young, and, okay, she felt he was too young, and that he could not handle the attitudes of the representatives that he supervised. She also said that because they used to be competition together, now that he is her manager, he doesn't know how to manage her, and it created friction between them. So after she returned from her leave... Counsel, I want to go back to the point we were discussing before. I'm looking at your friend's opening brief at page 14, and he's citing either the plaintiff's declaration or deposition. And he's describing in here and citing ER 33 a conversation with the supervisor and said, I told Megan that I never said anything about my former supervisor. She said that we have two people who said you said some things about Dale Mason that we have to suspend you and that we are going to have an investigation. Is there anything in the record that you can point us to where during this interview with Megan, Megan told her what the alleged derogatory remarks were that she had allegedly made about Mr. Mason, other than we have two people who said you said some things about Dale Mason and we have to suspend you? There is nothing in the record that states what Ms. Lago said to her in their interview. Okay. Were the interview notes that some of them talk about direct statements, were those made available to Ms. Foster? No. Why not? That is, the interview notes are usually never provided in these types of investigations. And the company always tries to protect the confidentiality of the informants. So these investigation notes would not have been handed over. They're confidential as part of the investigation. And, Your Honors, Ms. Foster denied making any derogatory, using any derogatory language in the workplace. But we have two independent employees who have, there's no evidence of a scheme. They reported this conduct. Credit One independently interviewed them. They both confirmed that this did occur. Although that may well be true, Counsel, but it just seems strange to me that you have a longtime employee and there are very specific reasons that you're firing her. I mean, it's not in this case, but you stole $87. You falsified your time records. You threatened an employee. Here it is, very specific alleged statements to two coworkers that reasonable people would view as in violation of the company's policies and offensive. But it's just strange to me that when you're going to be taking this kind of an action, you don't tell the person what it is they're supposed to have done. Because it strikes me as very hard to defend against allegations where you don't even know what they are. And you're saying that is the standard policy, that when someone is accused of misconduct toward fellow employees, they're not told precisely what it is that they're alleged to have done? I'm saying that the employees who reported the conduct, those identities are usually not shared. The interview notes do not say whether Ms. Lago told Ms. Foster the derogatory terms that she said. She says she's denying, in the interview note, she says she denies making these statements. So a reasonable inference, we could assume that she was told what was alleged against her. I don't see that. I mean, she says here what it is she was told. We have two people who said you said some things about Dale Mason. We have to look at the evidence in the light most favorable to her, right? Yes, Your Honor. But even if she was told specifically it was reported that you said the N-word and the F-word, she would have denied those things. She denies it in her interview that she made any derogatory statements towards Mr. Mason. So we rely on— Does it matter to whom she directed the comment if she used the N-word about a coworker? No, Your Honor. Any obscene language in the workplace is a violation of company policy. I don't have any problem with that. I'm sorry. No, that's all right. Go ahead. My issue is an inference that this was a predetermined outcome because she wasn't specifically told what she had allegedly done, that looking at the evidence in the light most favorable and on the evidence here, I see your friend's point that if she isn't even told what it is exactly that she has done, that maybe there's an inference there that this is all cooked up. Your Honor, in order for this scheme to be a part of any ADA discrimination, FMLA retaliation claim, the motive has to be because she had a medical condition or because she took FMLA leave, and there's nothing in the record that anybody had any discriminatory animus towards her due to these things. Could I ask you, you've called our attention to these notes. They're handwritten notes. I'm looking at 187, 188, and 189 in particular. Whose handwriting is this? Maybe I'm misunderstanding the authorship of these notes. Those are Ms. Lago's interview notes. She was the HR director. Who interviewed who? She interviewed the two employees who reported the conduct, which was Ebony White and David Tillman. She interviewed Ms. Foster. Okay, so on 189, then, there's the reference. There's an N word about called him this word, but it says David Tillman at the top. So I should understand that he's telling the HR person that this happened. Okay, so I'm looking now for the page that would have been the interview notes for the plaintiff, Ms. Foster. I see Ebony White on the top of another page. I think I have been misinterpreting these notes, and I don't see where the written notes that relate to interviewing Ms. Foster. I believe it would be page 192. I think it's towards the end. Well, that's a one-line statement from Rosalina Williams. It says it was brought to my attention about Ms. Nicole and whether she had her FMLA hours. That is not a handwritten note, an interview note. But you think that she was interviewed, Ms. Foster was interviewed, and that she denied making these statements. You've said that several times here today. One challenge I've got is that on ER 186, it looks like there's a sticky note on top of the handwritten note. It says derogatory comments. The sticky note itself says derogatory comments about something. Supervisor, we have factual statements. It's hard to read the rest of this note, but it's on top of some of the text. Does that ring a bell? Does that correlate to the interview notes with Ms. Foster? Yes, it's part of the investigation file and part of her investigation. Okay, so ER 185, at the top of the page it says Nicole Foster. Should I understand that those notes are an HR person interviewing Ms. Foster? Yes. Okay, so she says she hasn't made any derogatory comments. It's the first thing she said, right? Yes. I have one question. Picking up on the response that you gave to Judge Bennett, I take it your position is that even if this was an unfair termination proceeding because she wasn't told about the specific claims so that she could rebut them, there was no evidence that her termination was motivated in any way because of her actions in taking family leave or claiming ADA disability. Is that your point? Yes, Your Honor. Thank you. I'm glad I got it. His theory is that, and it's a bit convoluted. It took me a while to trace this through. His theory, I think plaintiff's theory, is that there was not a legitimate non-discriminatory reason, that the company is claiming that these slurs were the legitimate non-discriminatory reason, and he's arguing pretext, I think, and that really what we should understand is that there's a question of fact about whether this was cooked up. What is your best response to that? There's no evidence of any conspiracy theory, and he needs evidence in order to defeat summary judgment, and there's nothing in the record that there is any agreement between the parties. The HR director independently confirmed that Ms. Foster said these words, and even if she was mistaken, even if the HR director was mistaken, the HR director needs to be able to rely on these witness statements, and she reasonably believed that these were true, and this court, nor jury, can second-guess Credit One's business decision when their decision was based on reasonable facts. So your point is they could have been wrong? They could have been wrong. They could have been relying on a faulty investigation, but they weren't discriminatory. That's what I hear you saying. That's what I understood your brief to be arguing. Yes, they could have been wrong, but that does not defeat summary judgment. There's no discriminatory animus here. Thank you. Thank you. First, I want to thank you, Judge Kristen, for accurately summarizing my argument more succinctly than I did on the pretext issue that that is the issue, and this was a kangaroo court. I mean, look at David Tillman's investigatory notes at ER 189. In his email, he talks about Nicole Foster said that Mason only messes with N-words, referring to herself as being one of the people that he messes with. Suddenly in the investigatory notes, Tillman is telling Megan Lago she was calling Mason the N-word. I mean, that's a significant escalation. I mean, it's still wrong to use the N-word in the workplace, but it's one thing to use it referring to yourself, which was Ebony White and David Tillman's email to Dale Mason and Vera Yannis Turigny, but all of a sudden in the investigatory he's saying she called her or she called Mason the N-word. That's escalation. There's obviously, like I said, it's a kangaroo court. Things are getting phonied up very quickly, and if you look at the notes on Ms. Foster's conversation, page 185, the only thing that's told to her is derogatory. She only made derogatory comments. So in the meantime, the allegations against her get progressively more and more fantastic, and she's never told what's going on. That is the evidence of pretext, and this happened very quickly, and so the recent decision that Judge Baya was involved in, the Meyer-Kama v. Mayorkas decision 107F4-1054 from a couple of months ago, the timing here is immediate. She reports Mason's unlawful docking of her pay on FMLA, and suddenly this fantastic investigation, which she's not even told the details, is launched. She's not given a chance to really refute the evidence until her unemployment hearing several months later, and so that's the evidence of pretext. And the argument that it was violating confidentiality to tell her that she accused Mason of messing with N and used the homophobic slur against him, you can tell her that somebody said that without violating confidentiality. You may not say the names of who said it, but you can actually tell her the words and the place without violating confidentiality. So the argument that you couldn't do this because of confidentiality is completely specious, and instead is evidence of pretext, because this was a kangaroo court that resulted in the problem of Nicole Foster and Allendale Mason butting heads repeatedly was solved by firing Nicole Foster after she complained about him violating her rights under the FMLA, immediately after that. And the ADA issue is because of the accommodation she needed was the intermittent FMLA. So there's an ADA overtone, but this is an FMLA case. And I thank you, Your Honors, for allowing me the chance to make oral argument in this. Thank you. Thank you. We'll take this case under advisement and go on to the final case on the oral argument calendar.
judges: BEA, CHRISTEN, BENNETT